*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. HAACK, Minor.

UNPUBLISHED
October 24, 2025
10:13 AM

No. 374254
Eaton Circuit Court
Family Division
LC No. 23-020893-NA

Before: FEENEY, P.J., and BORRELLO and BAZZI, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court order terminating her parental rights to the minor child, LH, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist) and MCL 712A.19b(3)(j) (child will be harmed if returned to the parent).[1] We affirm.

## I. FACTS

Respondent had a significant history of trauma, mental, and behavioral health concerns. In 2006, she was involved in a motor vehicle accident and suffered a traumatic brain injury. She had a history of anxiety, depression, post-traumatic stress disorder (PTSD), and psychosis. She participated in in-patient cognitive rehabilitation for about nine years, and she had been under a guardianship and conservatorship, which were removed in 2018.

In August 2022, Children's Protective Services (CPS) received allegations concerning the safety and well-being of the child. CPS conducted an investigation, and in September 2022, the family began receiving a plethora of services from CPS ongoing. In April 2023, CPS received new reports of concerns for the child's safety, indicating that respondent "appeared to be having a mental health crisis." CPS conducted an unscheduled home visit, and an unknown "white, powder substance" was covering the apartment floor and furniture. Respondent appeared frantic, and

---

[1] The trial court also terminated the parental rights of the child's father, Tommy Dees, but he has not appealed that decision and is not a party to this appeal

-1-

respondent and the child both presented with red, irritated hands.  The refrigerator and freezer were almost empty; respondent stated that she needed to throw away her groceries because she believed that the white powdery substance was getting into the food.  After this incident, the child was removed from respondent's care and placed with her maternal grandparents.

Respondent's barriers throughout this case were emotional stability, substance use, and parenting skills.  Regarding substance use, there was a concern for respondent's use of alcohol because she was "prescribed psychotropic medications to help address her mental health, and any use of alcohol [could] impact the effectiveness of those medications."  Respondent largely participated in her services throughout this case, which included randomly scheduled drug screens, home visits, counseling, Families Together Building Solutions (FTBS), psychiatric services, medication reviews, EMDR[2] therapy, and DBT[3] therapy.  But in September 2023, respondent's parenting time was suspended—and never reinstituted—after: (1) respondent missed a week of parenting time, which resulted in severe dysregulation for the child; (2) respondent began to exhibit signs of "significant instability"; (3) a home visit was conducted, and the home was found to be in disarray, including the observation of an empty liquor bottle; (4) respondent was hospitalized for "a day or two," during which time, her lab reports showed "an exceedingly high alcohol level"; and (5) following respondent's hospitalization, DHHS could not make contact with respondent for about five days.

During this case, the child exhibited severe signs of dysregulation—including self-harm behaviors—following any changes in parenting time or any therapy sessions that included "bigger" conversations about respondent.  Overtime, the child made several disclosures of abuse that occurred in respondent's home.  A trauma assessment was completed for the child, which recommended various therapy styles for the child and suggested that the child's caregivers participate in trauma-informed parenting exercises because "as she becomes older[,] her trauma may manifest in many different ways."  A forensic interview was also conducted concerning the child's disclosures that were sexual in nature—these disclosures were "investigated and ruled out as not having a preponderance of the evidence."  Notably, in August 2024, after being informed of these disclosures, respondent tested positive for alcohol.

In December 2024, the trial court, citing respondent's mental health barrier as well as the child's mental health needs, found that there was clear and convincing evidence that a statutory

---

[2] "EMDR" stands for "eye movement desensitization and reprocessing therapy," and it is a mental health treatment technique that "involves moving your eyes a specific way while you process traumatic memories.  EMDR's goal is to help you heal from trauma or other distressing life experiences."  Cleveland Clinic, *EMDR Therapy* <https://my.clevelandclinic.org/health/treatments/22641-emdr-therapy> (accessed September 4, 2025).

[3] "DBT" stands for "dialectical behavior therapy," and it "is a type of talk therapy for people who experience emotions very intensely."  Cleveland Clinic, *Dialectical Behavior Therapy (DBT)* < https://my.clevelandclinic.org/health/treatments/22838-dialectical-behavior-therapy-dbt> (accessed September 4, 2025).

basis existed for terminating respondent's parental rights and that termination was in the child's best interests. Respondent now appeals.

## II. REASONABLE EFFORTS

On appeal, respondent argues that the trial court erred by terminating her parental rights because DHHS did not use reasonable efforts to reunify the family. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

To preserve an argument that petitioner failed to make reasonable efforts at reunification, the respondent must "object or indicate that the services provided to them were somehow inadequate . . . ." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). In this case, respondent repeatedly requested the reinstatement of parenting time, but she never objected to the adequacy of her other services. Therefore, this issue is preserved with respect to respondent's concerns with parenting time, but not preserved with respect to her concerns with other services. See *id*.

"We review for clear error a trial court's decision regarding reasonable efforts." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). We review a trial court's decision to suspend or modify parenting time for an abuse of discretion. See *In re Laster*, 303 Mich App 485, 490-491; 845 NW2d 540 (2013), superseded by statute on other grounds by *In re Ott*, 344 Mich App 723, 737-741; 2 NW3d 120 (2022). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *In re COH, ERH, JRG, & KBH*, 495 Mich 184, 202; 848 NW2d 107 (2014) (quotation marks and citation omitted). Additionally, we review "for clear error a trial court's factual findings following a termination hearing." *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (quotation marks and citation omitted).

"[U]npreserved issues are reviewed for plain error affecting substantial rights." *In re Sanborn*, 337 Mich App at 258 (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. (quotation marks and citation omitted).

## B. ANALYSIS

Under Michigan's Probate Code, DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). Therefore, "when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005), citing MCL 712A.18f(1), (2),

and (4). "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86.

## 1. RESPONDENT'S "DISABILITY"

Respondent's first, unpreserved, argument is that no accommodations were made for her "disability"[4] because DHHS did not "provide accommodations to Mother regarding her understanding of the case service plans and what was expected of her." This argument lacks merit.

DHHS "also has obligations under the ADA that dovetail with its obligations under the Probate Code." *Id*. at 86. For example, "the ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. (quotation marks and citation omitted). Moreover, "[p]ublic entities, such as [DHHS], must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service provided." *Id*. (quotation marks and citation omitted).

There is absolutely no indication in the record that respondent was dissatisfied or unable to participate in the services that DHHS provided for her. Before the child was removed from her care, respondent participated in a plethora of services, including some long-term, in-patient services, "CPS investigations, CPS ongoing, law enforcement, [FTBS], EVE [counseling and advocacy], Samaritas [substance use disorder services], Forensic Fluids, Families First, Siren [housing and advocacy], and Helios Psychiatry [medication monitoring]." During the pendency of this case, respondent continued to participate in the following services: randomly scheduled drug and alcohol screenings, home visits, mental-health hospitalization, counseling, FTBS, psychiatric services, medication reviews, EMDR therapy, and DBT therapy. In fact, respondent was so committed to her services that she initiated and completed "around 100 hours" of online parenting skills classes throughout this case.

There is no question that respondent was able to actively participate in the services that DHHS provided in this case. The trial court explicitly stated, "I will give Mom all the credit in the world; for actively participating in the services that have been asked of her." Additionally, at the termination hearing, respondent testified that her medications were now "right," and that she had "a significantly larger toolbox of coping mechanisms, and a support team, and a better understanding of what mental health, for [her], looks like and presents itself."

Respondent fails to explain how petitioner should have tailored its services to her needs beyond a conclusory statement that petitioner did not adequately address her "disability" or provide her with accommodations regarding her understanding of the case service plans and what was expected of her. Accordingly, any argument that respondent's extensive services were not

---

[4] Respondent had a "history of anxiety, depression, PTSD, and psychosis." Accordingly, it appears that respondent is referring to the "disability" of "emotional stability," or lack thereof.

appropriate—considering respondent's individualized needs—lacks merit, and the trial court did not plainly err by finding that her services were appropriate in this regard. See *In re Hicks/Brown*, 500 Mich at 85-86; *In re Sanborn*, 337 Mich App at 258.

## 2. PARENTING TIME

Respondent further argues that DHHS did not provide reasonable efforts concerning parenting time because: (1) even though she participated in all other services, she was not given the chance to participate in parenting time for a large portion of this case, and (2) the trial court improperly left the parenting-time decision up to the child's therapist.

"If a juvenile is removed from the parent's custody at any time, the court shall permit the juvenile's parent to have regular and frequent parenting time with the juvenile." MCL 712A.13a(13); see also MCL 712A.18(1)(p). But, "[i]f the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists." MCL 712A.13a(13); MCL 712A.18(1)(p). "The court may order the juvenile to have a psychological evaluation or counseling, or both, to determine the appropriateness and the conditions of parenting time." MCL 712A.13a(13); MCL 712A.18(1)(p).

Early in this case, respondent missed a week of parenting time, which had a negative impact on the child. The child demonstrated the following behaviors that were noted as more severe following visitation, changes in visitation, or cancellation of visitation: "regression, mood swings, challenges with self-regulation, disrupted sleep cycle, nail biting, and aggression." DHHS initially attempted to work with respondent to "revamp" the parenting-time schedule, but respondent exhibited "some significant instability," to the point that in September 2023: (1) a home visit was conducted, and respondent's home was found to be in disarray; "there was an empty liquor bottle," "many items had been used as an ashtray," "it appeared that the dog hadn't been out for quite some time," and glass from a broken window was found on the front stoop; and (2) respondent was hospitalized for "a day or two"; during that time, her lab reports showed "an exceedingly high alcohol level . . . ." Following respondent's hospitalization, DHHS was unable to make contact with respondent for about five days, during which time, DHHS moved for a suspension of parenting time that the trial court granted. Because there were serious, and reasonable, concerns that respondent's mental-health presented a risk of harm to herself and the child, we conclude that the trial court did not err in its initial suspension of parenting time. MCL 712A.13a(13); MCL 712A.18(1)(p).

The trial court continued the suspension of parenting time to determine whether respondent could be consistent and predictable for the child. MCL 712A.13a(13); MCL 712A.18(1)(p). Eventually, the trial court ordered that respondent could send the child cards and letters, and when respondent's therapist and the child's therapist both believed that contact could begin in a

therapeutic setting, they could "tiptoe towards that."[5]   Considering the child's ongoing dysregulation, need for consistency and stability, ongoing disclosures of abuse in respondent's care, and express desire to not see respondent, this parenting-time order lasted up until the termination hearing.

Contrary to respondent's argument that "[t]here is a serious question as to whether the lower court in this situation could leave parenting time decisions to the unfettered discretion to a therapist," a trial court may rely on a child's counselor's opinion when determining "the appropriateness and the conditions of parenting time."  MCL 712A.13a(13); MCL 712A.18(1)(p).

Respondent specifically argues that relying on the child's therapist's opinion regarding the appropriateness of parenting time was an error because: (1) her therapist relied almost exclusively on reports from the child's placement who desired to have respondent's parental rights terminated, (2) there were concerns that the placement had "coached" the child regarding the disclosures that led to a forensic interview, and (3) the child's dysregulation was "evidenced almost entirely from accounts given by placement."  These arguments lack merit.

First, the child's therapist did not rely exclusively on reports from the child's placement when making her recommendations—in fact, her therapist had: (1) ample communication with respondent throughout this case; (2) the benefit of the child's 55-page trauma-assessment report, and (3) been meeting with the child since this case began, when the child was just three years old. Second, the child's therapist was not "necessarily surprised" to learn that the forensic interviewer believed that the child had been coached regarding the disclosures that led to the forensic interview—because "[i]t was a very detailed event for such a young child to recall and be able to report on."  Yet, when directly asked whether she thought the child was coached during the child's interactions with her, the therapist replied in the negative, stating that the child was consistent with her language and able to explain her statements, and that the child was empathetic and "very in tune to people's emotions."  Third, the child's dysregulation was directly seen by many parties throughout this case, especially her therapist.  In fact, her therapist specifically testified that in the past, she had been concerned that the child's grandmother was reporting the child's trauma-based behaviors in a way that made them seem bigger than they were; however, after seeing the behaviors herself, the therapist no longer had that concern.

Respondent also challenges the fact that parenting time was never reinstituted despite her participation in services.  But, again, "[i]f the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists."  MCL 712A.13a(13); MCL 712A.18(1)(p).  In this case, the trial court believed that the risk of harm—concerning the child's mental needs and respondent's mental well-being—was present throughout the case despite respondent's participation in services.  The trial court reasoned that respondent's alcohol relapse in August 2024, years after services and therapy had been provided to her, displayed that her

---

[5] In its written orders, the trial court specifically stated the following: "Parenting time of [respondent], limited to cards, pictures, and letters until authorized by therapist, then is . . . supervised until further order of the court.  IN A THERAPUTIC [sic] SETTING."

mental-health and substance-use barriers remained. The trial court also noted its concern with whether respondent had "an understanding of [the child's] mental health needs." The trial court explained that "[m]om's efforts matter, and what she has done matters, but whether this child would be harmed if returned to this parent, I think the Court is, certainly, persuaded that the weight of the testimony today, is that she would be." Accordingly, the trial court did not err by continuing the order suspending respondent's parenting time despite her participation in services. See MCL 712A.13a(13); MCL 712A.18(1)(p); cf. *In re Ott*, 344 Mich App at 742-743 (automatic suspension of parenting time for THC[6] use was erroneous without examination of MCL 712A.13a(13) and a determination that parenting time, even if supervised, may have harmed the child's life, physical health or mental well-being).

### III. STATUTORY GROUNDS AND BEST INTERESTS

Respondent does not challenge the trial court's finding that statutory grounds for termination were established by clear and convincing evidence. Thus, we may presume that the trial court did not clearly err by finding that the unchallenged statutory grounds were established by clear and convincing evidence. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich 341, 353-354; 612 NW2d 407 (2000). Respondent also does not challenge whether termination was in the child's best interests; therefore, respondent has also waived any challenge to the trial court's findings in that regard. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019) (explaining that an issue is deemed abandoned if it is insufficiently briefed on appeal or not raised in the statement of questions presented).

Affirmed.

/s/ Kathleen A. Feeney
/s/ Stephen L. Borrello
/s/ Mariam S. Bazzi

---

[6] Tetrahydrocannabinol, or THC, is the psychoactive component of marijuana. *In re Ott*, 344 Mich App at 725.